HENRY EVERETT HATON, Appellant, v. ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation.—76 S. W. (2d) 127.

Division One, November 16, 1934.

*F. A. Foster, Strubinger & Strubinger* and *Allen, Moser & Marsalek* for appellant.

*Watts & Gentry* for respondent; *Charles A. Helsell* of counsel.

FERGUSON, C.—Action for damages for personal injuries sustained by plaintiff on November 15, 1929, in a collision between an automobile which he was driving and railroad cars "kicked" by one of defendant's locomotive engines at a grade crossing over defendant's tracks within the corporate limits of the city of East St. Louis, Illinois. Upon a trial in the Circuit Court of the City of St. Louis plaintiff had a verdict for damages in the sum of $20,000. Defendant's motion for a new trial was sustained and a new trial ordered on the ground that the court erred in giving plaintiff's instruction numbered one, from which order plaintiff has appealed. An examination and understanding of the instruction, the giving of which the trial court specified as the ground of its order granting a new trial, requires a statement of the facts developed by the evidence. Defendant's railroad tracks run north and south and Chartrand Avenue, a much traveled public street of the city of East St. Louis, is located a short distance east of and runs north and south parallel with the railroad tracks to the point where it crosses at grade in a southwestwardly direction over defendant's tracks. The street passes over three tracks. The east track is the main line track, the middle track is referred to as the thoroughfare track and the west track, at which the collision occurred, as the switch lead. There is a space of twelve feet between the tracks so that it is at least thirty-four feet from the east rail of the east or first track to the east rail of the third or west track. The crossing is made of blocks and planking and is thirty feet in width north and south. There is a red electric signal light on each side of the crossing referred to as a "flashing light signal." There is evidence on the part of defendant that there was also an automatic gong on the west side of the crossing. Plaintiff's evidence is that if there was a gong on the west side of the crossing it was not sounding at the time of or immediately before the collision and that a gong had not been in operation at that point for a long time prior to the date of the collision. As to the "flashing light signal" plaintiff's evidence was that the red light flashed continuously as a railroad crossing warning while defendant's evidence was that the light signals flashed and the gong rang only when trains or cars were standing or moving on one of the three tracks at the crossing or within a certain distance from either side thereof and were warnings of the close proximity of a train or cars to the crossing. According to defendant's evidence a train or car, moving or standing, on either of the tracks, within a certain distance of the crossing would automatically complete an electric circuit and cause the signal lights to "flash" and

the gong to ring. Defendant's switch yard was a short distance north of the crossing and in carrying on switching operations it was often necessary to move cuts of cars over this crossing and it seems that at times as convenience might suggest and as the switching crew deemed expeditious to the switching operation then in progress a car or cars would be cut off from a train or cut of cars and "kicked" over the crossing as was done on this occasion.

Plaintiff resided at Falling Springs, Illinois, about eight miles south of East St. Louis. Shortly after two o'clock, Sunday afternoon September 15, 1929, accompanied by two companions, Otto Swalls and Homer Daniels, plaintiff left East St. Louis intending to go to his home at Falling Springs. Plaintiff was driving his brother's automobile, a Dodge touring car. Swalls was in the front seat with plaintiff and Daniels alone in the back seat of the automobile. Plaintiff drove south on Chartrand Avenue and then turned southwestwardly over the railroad crossing. When the automobile was upon the third or westernmost track it was struck by the northernmost one of two railroad freight cars which had been uncoupled from a cut of cars south of the crossing and "kicked" north over the crossing. The automobile was crushed and plaintiff injured.

Plaintiff testified that as he was driving south on Chartrand Avenue he saw one of defendant's locomotives and a train of eight or ten freight cars moving south on the westernmost of the three railroad tracks over which Chartrand Avenue passes at this crossing; that there was no other train in sight; that at about the time he turned the automobile toward the west or southwest and was approaching the east side of the crossing the rear or northernmost car of the train passed over the crossing; that the train stopped south of the crossing with northernmost car about thirty feet south of the south side of the crossing; that he brought the automobile to a complete stop about twenty feet east of the first or east track; that he stopped the automobile at that point for "a minute and a half or two minutes" during which time "I was watching to see if there was any train coming in and to see what this train that had stopped was going to do;" that he didn't "see any trainmen on this train" or "on the ground or around there;" that there was no watchman or flagman, or other person, on, at or near the crossing; that he looked both to the right and left (north and south) and there was no train in sight except this train standing on the third track south of the crossing; that he then drove onto and proceeded across the crossing driving in low gear, at not more than three or four miles an hour, and continued driving at that slow speed until as the automobile was going upon, or had just gotten upon, the third track he for the first time discovered the two railroad cars which had been "kicked" north moving toward the automobile whereupon he tried

to accelerate the speed of the automobile; that the brakes on the automobile were in good condition and that he could have stopped the automobile at any time "within a foot or a foot and a half;" that as he turned toward the crossing, during the time the automobile was stopped and stood about twenty feet east of the first track and as he started over the crossing the red signal light was flashing continuously; that when the automobile reached the first track he saw some "smoke down in the yards . . . about two blocks" north of the crossing and thereafter he continued to watch this smoke looking to the right or north; that he did not again look to the left or south and toward the train on the third or west track until the "front of the automobile was between the middle track and the west track," on which the train was standing, and that the "cars were then standing still" and he then again turned his attention to the north; that as the "right front wheel of the automobile was crossing the east rail of the west track" he heard "a bumping of cars," looked to the south and saw two freight cars which had been separated from the train of cars south of the crossing "bearing down upon me at a speed of around twenty miles an hour" and that when he first discovered the two cars moving north over the crossing they were "about twelve feet from me;" that the train had moved north some time before the cars were "bumped and I noticed them;" and that he then "tried to get across the track but couldn't go fast enough" and the moving cars struck the automobile on the left side about the center. Plaintiff stated that he was driving north of the center line of the crossing and at least fifteen feet north of the south side of the crossing. Plaintiff's statement of events was for the most part corroborated by his companions, Daniels and Swalls. Daniels said that as the automobile went over the first track he glanced toward the south and observed that the engine and cars were then "standing still" but that he did not again look in that direction until he "heard a bump;" that at that time the front end of the automobile was on the third track; that when he heard "the bump" he looked south and saw the moving cars "about ten feet away." Swalls, who was riding in the front seat with plaintiff testified that when the automobile was stopped east of the crossing he observed the flashing of the signal light and that it "flashed as long as we stood there;" that the train moved south of the crossing and stopped with the north end of the rear or northernmost car about fifty or sixty feet south of the south side of the crossing; that he said, "I guess that cut of cars is going to stand there" and that plaintiff replied "I guess it is;" that he looked to the left or south one time after the automobile started over the crossing "when the automobile was somewhere around the second track" and at that time "the engine and cars were standing still;" that thereafter he was looking north; that when

the front end of the automobile got "on this west track" he "heard a jamming of cars and looked to the left" and saw the two cars then "about thirty feet from the automobile" coming toward it "at a fast speed." The cars were sent uncontrolled over the crossing, that is no trainman was stationed on them. Plaintiff's evidence is that there was no trainmen, watchman or flagman on, at or near the crossing and that no signal or warning by whistle or bell or otherwise was given of the backward or northward movement of the train or cars.

On the part of the defendant the evidence was that this engine and cut of cars was engaged in a switching movement; that the train came from the switch yard north of the crossing passed over the crossing and stopped south thereof with the rear or northernmost car about eighty feet south of the south side of the crossing; that it was intended to "kick" the two rear cars north over this crossing and cause them to run onto a switch track north of the crossing; that the "kicking" movement was made by a quick movement of the train northward and the uncoupling of the cars which were to be cut off permitting them to run of their own momentum; that as the engine and cars passed south and over the crossing the switch foreman in charge of the switching operation took a position at the west side of and on the crossing "to protect the crossing;" that the train was stopped but "a few seconds before it started back; only as long as it takes to stop an engine and start it;" that when the train stopped the foreman from his position on the crossing "gave a kick signal for a back up movement" and the engineer immediately started the back up and kick movement sounding the whistle as he did so; and that as the train moved northward the two rear cars were uncoupled, by a switchman who was riding on the west side of the train, and allowed to run uncontrolled over the crossing. The switch foreman testified that he saw the automobile come upon the east side of the crossing; that two other automobiles had stopped east of the crossing awaiting the completion of the train movement; that plaintiff's automobile "ran around" the two automobiles that were standing east of the crossing and that he gave plaintiff a signal to stop and that thereupon plaintiff brought his automobile to a complete stop; that he then gave the kick signal and the backing and kicking movement commenced. According to the foreman's testimony the automobile stopped upon or a few feet east of the middle track. Defendant's evidence was that the automobile stopped "for merely an instant" and then started forward moving slowly and that the backward or "kick" movement of the train had already started and was underway when the automobile started up and "we could not have stopped those two cars after that." And the switch foreman testified that when the automobile "started up I tried to stop him (plaintiff) a second time by hand signals and also shouting at him to

stop . . . he (plaintiff) could have seen me . . . he continued at the same rate of speed until he was hit.'' This version of events was corroborated by the fireman and in some of the more essential details by other witnesses for defendant.

Each of plaintiff's given instructions numbered 1 and 2, but on separate and distinct theories, authorized a verdict for plaintiff. Instruction 2 was to the effect that if the jury found that ''defendant's agents and servants knew, or in the exercise of ordinary care could have known that plaintiff's said automobile was on said crossing and was approaching the track used by said train . . . and knowing such facts . . . kicked standing cars and caused them to run across said crossing without a locomotive engine attached thereto and failed before doing so to give the plaintiff any warning by bell, whistle or otherwise that said cars were about to be so moved across said crossing; and . . . that defendant's said agents and servants in kicking said cars across said crossing without a locomotive engine attached thereto and without first giving any warning by bell, whistle or otherwise, if you so find, failed to exercise ordinary care and were negligent and that as a direct result of such negligence, if any,'' plaintiff's automobile was struck by said cars and plaintiff injured the ''verdict will be in favor of plaintiff and against defendant.'' No complaint is made of this instruction and it clearly requires a finding which under the law applicable to the situation, as we shall presently point out, makes defendant liable. Plaintiff's case was in fact predicated upon the theory of this instruction, that is, that the defendant's employees made this kicking movement and caused the cars to run uncontrolled over the crossing without, before doing so, giving any warning of such movement.

Plaintiff's right to recover and defendant's liability is determined and governed by the law of the State of Illinois, the *lex loci*, and the humanitarian rule which we recognize in this State cannot be invoked and has no place in the case (Cox v. Terminal Railroad Assn., 331 Mo. 910, 55 S. W. (2d) 685) nor under the pleadings and evidence can liability be predicated on any theory of last chance which it may be claimed is recognized by the courts of Illinois. The pleadings do not include any charge of wantonness or willfulness. [Carson, Pirie, Scott & Co. v. Chicago Ry. Co., 309 Ill. 346, 141 N. E. 172; Cox v. Terminal Railroad Assn., supra.] However, plaintiff offered and the trial court gave an instruction, the vital and pertinent part thereof being, that if defendant's employees in charge of the engine and cut of cars ''knew or by the exercise of ordinary' care could have known that plaintiff's automobile was dangerously near and upon the track on which the train stood . . . and caused said cars to be kicked and to run uncontrolled toward said crossing at the time plaintiff's said automobile was dangerously near and was

going upon said track'' and were negligent in so doing the verdict ''will be in favor of plaintiff.'' This is the instruction which the court held was error and assigned the giving thereof as ground for granting the new trial. The instruction, in effect, told the jury that though the defendant's employees in charge of the train and the switching operations gave adequate and timely warning of the intended kick movement of the railroad cars over the crossing and though the movement was under way, as defendant's evidence tended to show, when plaintiff started the automobile from a point of safety and proceeded toward the track on which the cars were then moving that nevertheless if the cars ran uncontrolled upon the crossing ''at the time plaintiff's said automobile was dangerously near and was going upon'' the track the jury would be warranted in finding defendant was negligent. There is no evidence which tends to show that after the kick movement had started the train or the cars could have been stopped in time to have averted the collision after, according to defendant's evidence, plaintiff ignoring the foreman's signals and shouts, drove on across the crossing and upon the track on which the cars were moving but the instruction permits the plaintiff to recover if the jury found that the cars were caused to run uncontrolled toward the crossing at a time when plaintiff's automobile was dangerously near and going upon the track. All the evidence is that the cars were moving uncontrolled toward the crossing at that time but there is a very sharp conflict as to the events and circumstances immediately preceding and whether defendant negligently made this kick movement is to be determined by a finding as to whether adequate warning was given before the cars were allowed to move onto and over the crossing. The conclusion seems irresistible and plaintiff's own testimony admits, that the kick movement started before the automobile reached the third track. The automobile was traveling, as plaintiff testifies, on the north side of the roadway at least fifteen feet north of the south side of the crossing. Plaintiff's evidence estimated the north end of the train of cars when stopped was thirty feet or more south of the south side of the crossing. The occupants of the automobile say that as the front wheels of the automobile reached the east rail of the track they, for the first time, discovered that the cars were moving and were then only ten to twelve feet from the automobile. Too in view of plaintiff's testimony that he was driving the automobile in low gear and so slowly that he could have stopped it within the distance of ''a foot or a foot and a half'' little if any support is to be found in the evidence for the theory that the kick movement was not started until after the automobile was ''dangerously near and going upon the track;'' for if moving cars were within ten or twelve feet of the automobile when only its front wheels reached the east rail of the track surely the automobile

must have been at a sufficient distance east of the track that it could have been stopped when the movement started and was not therefore "dangerously near" or actually "going upon the track" at the time. If plaintiff drove as slowly as he states his automobile was indeed moving very slowly.

This instruction appears to be an attempt to incorporate and combine to some extent the elements of the last chance rule and the humanitarian doctrine, as we recognize that doctrine in this State, but as we have pointed out neither is applicable under the law of the State of Illinois and the pleadings and evidence in this case. But given as it was in conjunction, and upon an equal footing, with the instruction telling the jury it could find defendant guilty of negligence if it found that the kick movement was made without any warning thereof being given, the instruction is confusing and misleading, and in effect contradictory, as tending to convey the impression that though defendant gave the warnings as shown by its evidence nevertheless a movement of that character over a public street crossing constituted negligence and authorized the jury to find defendant guilty of negligence even though adequate warnings were given. It permitted the jury to find that such a movement was negligence regardless of the attendant circumstances. Appellant says "there is weighty authority to sustain the proposition that the kicking of railroad cars across a street or highway within the confines of a city is negligence *per se*." It is said in some texts that it had been held that the "kicking of cars" or making "flying switches" at a public road or street crossing in a populous town or city is negligence *per se*. However, we think, that upon an examination of the cases cited it will be found that in most instances the train movement involved was made without an adequate warning being given and without taking precautions to protect the crossing. It is true such movements are generally considered as being hazardous and dangerous and as demanding that care and precautions commensurate with the hazard created be taken to properly protect the crossing. We find the authorities listed and the general rule of law applicable to such a situation well stated in 3 Elliott on Railroads (3 Ed.), pages 533-534 as follows:

"It is frequently said that it is negligence *per se* to make a 'flying switch' or 'kick' a car over a crossing, or to push a train backward over a crossing, without warning and in the absence of a lookout. It is doubtless true that there are many cases in which but one reasonable inference can be drawn, and the court can say, as a matter of law, that it is negligence to make a 'flying switch' or 'kick' a car over a crossing where people are likely to be, as, for instance, in a populous city, *without giving any notice or taking other precautions to protect them,* or to back a train over such a crossing *without warn-*

*ing or other precautions.* It may, therefore, not be incorrect to say that such conduct, without taking any precautions, is ordinarily negligence *per se.* But we think that much must depend upon the peculiar circumstances of each particular case, and that it is going too far to say that making a 'flying switch' or 'kicking' or backing cars, is negligence *per se,* or as a matter of law, under any and all circumstances. It is certainly not negligence, if proper precautions are taken, and whether the company has taken such precautions and used reasonable care under the circumstances is generally a question of fact for the jury.''

We are of the opinion that the giving of the instruction was error and that the order of the trial court granting a new trial on that ground should be and same is affirmed. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.